IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 1, 2022

**IN RE MIRANDA T., ET AL.**

**Appeal from the Juvenile Court for Crockett County
No. 2019-DN-3     Paul B. Conley, III, Judge**

**No. W2021-00628-COA-R3-PT**

This appeal concerns the termination of a mother's parental rights to her minor children. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Crockett County ("the Juvenile Court") seeking to terminate the parental rights of Tiffany T. ("Mother") to her minor children, Miranda and Baylee ("the Children"). After a hearing, the Juvenile Court entered an order terminating Mother's parental rights on four grounds and finding that termination of Mother's parental rights is in the Children's best interest. Mother appeals, arguing solely that the Juvenile Court erred in its best interest determination. We find, as did the Juvenile Court, that DCS proved four grounds for termination of parental rights against Mother by clear and convincing evidence. We find further by clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Children's best interest. We affirm the judgment of the Juvenile Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;
Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY W. ARMSTRONG, JJ., joined.

Bob C. Hooper, Brownsville, Tennessee, for the appellant, Tiffany T.

Herbert H. Slatery, III, Attorney General and Reporter, and Kathryn A. Baker, Senior Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

# OPINION

## Background

Miranda was born to Mother and Mother's husband, Robert T. ("Father"), in April of 2009.[1] Baylee was born to Mother and Father in March of 2012. DCS has a history with Mother and Father going back to 2012. Specifically, DCS was concerned among other things about the family's lack of a stable home, lack of financial resources, and lack of proper hygiene and medical care. In November 2018, DCS received a referral alleging environmental neglect concerning the Children. After a meeting held that month, Father agreed to send the Children to Baptist Children's Home while he was getting established. That, however, did not happen. Father instead took the Children to Baton Rouge, Louisiana. In January 2019, Mother went to Louisiana and retrieved the Children. Upon returning to Tennessee, Mother granted power of attorney to Jillian and Justin M. ("the Foster Parents"). Jillian M. was a special education teacher at the Children's school.

In February 2019, DCS filed a dependency and neglect petition asking that temporary custody of the Children be granted to the Foster Parents. Consequently, the Juvenile Court entered an *ex parte* protective custody order toward that end. The Juvenile Court found probable cause that the Children were dependent and neglected; that there was no less drastic alternative to removal; and that it was reasonable to make no effort to keep the Children in their home. The Foster Parents assumed temporary legal custody of the Children. In June 2019, DCS moved to assume custody of the Children. Following a July 2019 hearing, the Juvenile Court entered an order finding by clear and convincing evidence that the Children were dependent and neglected and granting custody of the Children to DCS. In relevant part, the Juvenile Court based its finding on Mother's involvement in a relationship marked by domestic violence and her inability to financially support the Children.

In July 2019, a permanency plan was developed for Mother with the goals of exit custody with relative and return to parent. Mother participated in the plan's development, and she signed the plan. Mother also signed the Criteria and Procedures for Termination of Parental Rights. This first permanency plan included the following responsibilities for Mother: (1) follow recommendations of parenting and psychological assessments; (2) show residential stability for at least six consecutive months by rent and/or utilities receipts; (3) allow DCS home visits and consistently be able to show a clean home; (4) ensure the Children are not around sex offenders; (5) visit each week with Baylee and show an ability to properly supervise, care for, and parent the Children; and (6) follow recommendations

---

[1] In this case, the Juvenile Court terminated both Mother's and Father's parental rights to the Children. However, Father did not appeal. This appeal concerns only Mother's parental rights. Facts regarding Father are set out only to the extent they relate to Mother's case.

from Camelot, a service provider, regarding supervised visits. Mother and her boyfriend, Chad, were both required to: (1) participate in domestic violence services and (2) work in-home services to address parenting.

In January 2020, a revised permanency plan was developed. The goals of this second plan were adoption and exit custody with relative. Mother's responsibilities remained largely the same. However, there were more details added regarding recommendations from Mother's parenting and psychological assessments, as well as keeping her home appropriate, clean, and safe with functioning utilities. The revised plan also required Mother to keep in monthly contact with DCS. Mother's and Chad's joint responsibilities remained largely the same, although the responsibility concerning in-home services specified that they needed to address environmental concerns. Mother did not participate in the development of this revised plan. However, DCS reviewed the revised plan with Mother. Mother refused this time to sign the parental rights termination criteria document; the criteria were explained to her nevertheless. On April 17, 2020, DCS filed a petition seeking to terminate Mother's parental rights to the Children. DCS alleged against Mother the grounds of abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plan, persistent conditions, and mental incompetence. In April 2021, this matter was tried. We review the pertinent testimony from trial.

The first witness to testify at trial was Taylor Allmon ("Allmon"), the Children's DCS case manager. The Children had continuously been in DCS custody since July 2, 2019. The Children were removed from the parents' custody in February 2019, at which time they were placed with the Foster Parents. As of trial, Baylee was placed with the Foster Parents, while Miranda was placed at a facility to address her special needs. DCS was found to have exercised reasonable efforts to prevent the Children's removal. Allmon testified to DCS's efforts to assist Mother in establishing a suitable home in the four months following the Children's removal:

> During the initial 4 months, the Department offered several services to include parenting, to help address the environmental and parenting concerns. We offered parenting assessments and psychologicals to see if further assessments were needed. We offered to set up counseling for the children as well as providing gas cards to her so she could see Miranda to maintain that bond and provide a supervised visitation between her and Baylee.

Allmon stated that during the same four-month period, from February 5, 2019 until June 5, 2019, Mother worked with parenting services but did not complete them. Mother did, however, complete a parenting assessment. During this time period, Mother did not have a suitable home for the Children. Since Allmon had been on the case, Mother had

nine different addresses, none of which were suitable for the Children. Allmon testified at length to the issues with Mother's homes:

> The first time when the case opened was in Maury City. There were several environmental and safety concerns. She did start out strong keeping the home clean but it very quickly deteriorated. The environmental concerns, there were visible leaks in the roof coming into the floor of one bedroom. There was an area of the floor in the living room that appeared bowed as if something was trying to come up through the living room floor. It was very common for rodents and insects to be seen in the home, including on the kitchen table or in the refrigerator. [Mother] had at least one incident in that home where she did not have running lights or working water - you know - and she also would consistently have issues where she would not have sinks or toilets working properly due to being clogged and would go for time periods without having anywhere to clean the dishes and things like that. There would be stagnant water in there. There was also consistent issues with ash trays and cigarette butts throughout the home, on the ground, and in the bed. The home she lived in next, she then moved to her mother's home in Alamo for a short time period. The concern at her mother's home is that her paramour who lives there is a registered sex offender, which has been a concern of [Mother] allowing the children to be around him previously. She then moved to … Alamo, Tennessee for a time period. Once again, the home was clean for a short time frame and then it very quickly deteriorated. There was at least one incident there where she did not have working lights and water. She told me she had to stay in the bedroom because there was not adequate - she had to stay in the living room as her bedroom because there was not adequate heat or air in the rest of the home, including what would have been the children's bedroom. On one visit, there was once again many cigarette butts laying throughout the home, in the floor, on counters, in the bed. There were open pocket knives laying throughout the house. The home was extremely cluttered to the point where you could not walk through certain rooms without stepping on various clothes and furniture, household items. And there was very vulgar writing on one of the walls calling [Mother] rather vulgar names. I, myself, witnessed a mouse in that home on a visit and saw the mouse feces in the kitchen on the counter. And she also had some exposed piping and venting from where her washer and heater should have been. After that, she then moved back to her mother's home for a time period, which once again, there is a registered sex offender living there. Once I told her that was not a suitable home, she moved to her grandmother's home … in Alamo, which I was never able to go in and see, but the grandmother did notify me it is only a one-bedroom home. So there

-4-

was concerns there was not appropriate room for [Mother] to be living there let alone the children. Then [Mother] went back to her mother[']s home, in which she would not allow me to come in at any point telling me that the home was dirty, her mother was not a good housekeeper and that the house smelled of cat urine. She then moved once again back to her grandmother's home. At this point, she did pay rent on a trailer in Humboldt but never moved into that home. She stated to me that it was not up to code and that she was waiting for it to be fixed so she could move in there. She never did physically move there to my knowledge. Most recently she has moved … [to] Bells, Tennessee. Upon my last visit, the home was clean but there were some safety concerns due to, once again, a lack of appropriate heating and air only in one room, exposed light sockets hanging from the ceiling. [Mother] also pointed out to me a spot in the kitchen in between the kitchen stove and the kitchen sink where the floor was very soft and she said she had fears of it falling through herself.

Mother had lived in her most recent residence since February of 2021. Six months was the longest Mother had remained at one residence. From October 2019 through February 2020, Mother would not allow Allmon into her home. In June 2020, Allmon attempted to make a scheduled visit to Mother's residence, but Mother left and Allmon could not go in. From September 2020 until March 2021, Mother again barred Allmon from entering Mother's residence. Mother was "upset" with Allmon. Mother also barred homemaker services from entering, even though they would have helped Mother with cleaning. Allmon stated further that Mother's boyfriend never participated in any DCS services.

With respect to Mother's compliance with the initial permanency plan, Allmon testified: "She did complete the parenting and psychologicals on those plans and she did remain in that current home for the 6 months; however, she moved right at that 6 month mark when she was in that home." When the permanency plan was modified, Mother did not substantially complete any of the requirements. Both plans were ratified by the Juvenile Court and found to be in the Children's best interest and reasonably related to remedying the reasons for foster care. Allmon said that the conditions in Mother's home had not changed in the two years the Children had been in custody. Allmon testified further that the Children reported being fearful of Mother's boyfriend, Chad. According to Allmon, changing caregivers would be detrimental to the Children at this stage in their lives. Miranda was then in a facility placement. Allmon stated: "Due to [Miranda's] cognitive abilities, we will sometimes see a regression. However, here recently she has maintained fairly well, especially in the educational setting at that facility." Allmon testified that Mother had not made any lasting change to her behavior that would make it possible to return the Children to her home.

On cross-examination, Allmon clarified that she had not worked on the Children's entire case; she came on board in July 2019. Allmon explained that Miranda was placed in a facility because of her behavior with the Foster Parents. Miranda had maintained the same sort of behaviors throughout, including disrobing and urinating on herself. Miranda was "not close to discharge" from the facility, and she required 24-hour supervision. On the matter of visitation, Allmon stated that Mother's visits with the Children had gone "fine." Miranda had even stated that she wanted to go live with Mother. Baylee had behavioral issues, as well, although not to the degree of her sister. Baylee, too, urinated on herself. When Baylee does this, the Foster Parents remove privileges such as television. Allmon testified that the Foster Parents have some reservations about adopting Baylee because of the "seeming increase in some of Baylee's behaviors…." Meanwhile, Miranda undergoes weekly therapy at the facility. Mother participates in those sessions. Allmon acknowledged that the Foster Parents could, if they decide not to adopt Baylee, turn in their 14-day notice at any time which would result in Baylee going to another placement. The situation with Miranda was even more uncertain, as it was unknown when she would leave the facility. Allmon elaborated upon Miranda's statements that she wanted to live with Mother, stating "she has, on the other hand, made the same comments that she does not want to do that. It kind of depends on the day and her disposition that day." Allmon stated that most of Baylee's "regressive behaviors," such as urinating on herself, occurred when in-person parental visits were scheduled. Baylee had been undergoing trauma therapy and adoption counseling. Allmon testified: "For [Baylee's] current behaviors, I would say [the parents] are not directly influencing her as in they are not directly making her have them. However, she is working through trauma that happened in the home through adoption counseling while this has come up."

When the Children first entered the Foster Parents' custody, the Children were significantly behind in their education, were very dirty, and had lice. The Foster Parents remedied those conditions. Baylee made significant gains in education, including reading at her grade level. With respect to Miranda, Allmon testified that Miranda's intellectual capacity is extremely low. The facility Miranda lives at sometimes notifies Allmon that Miranda has had an aggressive outburst. Even still, Miranda's behavior had improved "some." Allmon testified that there had been an internal investigation at Miranda's facility into an incident whereby Miranda was assaulted; someone at the facility was fired in connection with this incident. Asked if stopping Mother's visitation would have a detrimental effect on the Children, Allmon stated she was confident that adoption counseling would minimize any detrimental effect. Allmon acknowledged, however, that Miranda had been in a residential placement for two years and was no closer to leaving it.

The next witness to testify was Dr. Douglas Mays ("Dr. Mays"), Director of Clinical Assessments at Wayne Provision. Dr. Mays has an undergraduate degree in psychology

and biology from Bucknell University, as well as a Master's degree in school psychology. He earned a doctorate in counseling psychology from Argosy University. He also performed other graduate work at Vanderbilt and Tennessee State University. Dr. Mays had been licensed by the State of Tennessee for over thirty years, during which time he performed psychological evaluations. Approximately ten years into his practice, Dr. Mays began performing parenting capacity assessments. Dr. Mays was qualified as an expert without objection.

Dr. Mays completed a psychological evaluation and a parenting capacity assessment of Mother. The assessment began on June 25, 2019, and was completed on September 25, 2019. Dr. Mays asked Mother to complete a number of different psychology instruments. Mother complied. Dr. Mays testified that Mother is "low functioning cognitively." Mother has difficulty with judgment and turns to other people who "aren't particularly good choices." Dr. Mays stated that he saw no evidence of Mother being emotionally abusive toward the Children, but that there was more to parenting than just playing. Dr. Mays stated that, in his experience, people in Mother's circumstances require concrete, hands-on assistance with better parenting and family routines. Dr. Mays said that it was difficult, although not impossible, for people functioning in Mother's range to adapt to changing circumstances as parenting requires. Dr. Mays' report concluded that Mother was unlikely to follow the advice and instructions of the treating professionals with respect to Miranda's condition. Dr. Mays did not recommend returning the Children to Mother's custody. In addition, Dr. Mays said that if Mother did not follow through with his recommendations, such as in-home homemaker services, "we would be right where she was in 2019 obviously."

On cross-examination, Dr. Mays stated that he met with Mother on two occasions. He had not done anything to further his assessment of Mother since September 25, 2019. As to what has happened with Mother since then, Dr. Mays acknowledged: "I have no idea." Dr. Mays also acknowledged that, due to Mother's level of functioning, he had not been able to administer an inventory like the Minnesota Multiphasic Personality Inventory, which might have been helpful to his assessment. Dr. Mays observed Mother and Baylee interact and they appeared to be bonded.

Continuing our review of Dr. Mays' testimony, Dr. Mays' report reflected that Miranda's facility noted her psychiatric history of autism spectrum disorder. Dr. Mays testified that Mother's intellectual deficiencies could present a large hurdle to overcome in raising an autistic daughter. Dr. Mays then was asked about Baylee's improvement while in the Foster Parents' care, and to what extent an improved environment helps a child grow and be successful. He replied:

I can answer it this way. The average childhood experience's research shows that if you have a lot of things that aren't going right in the family home, that can result in physical and psychological problems for children and that can persist into adulthood. So the research suggests if those markers are for a negative outcome, you would think not having those markers and being in a healthy environment would be the opposite.

Allmon was recalled to the stand to testify further. Allmon agreed that, because of the Children's separate placements, terminating Mother's and Father's parental rights would essentially mean terminating the sibling bond.

In May 2021, the Juvenile Court entered an order terminating Mother's parental rights to the Children. The Juvenile Court found the following grounds were proven against Mother by clear and convincing evidence: (1) abandonment by failure to provide a suitable home; (2) substantial noncompliance with the permanency plan; (3) persistent conditions; and (4) mental incompetence. The Juvenile Court found further, also by clear and convincing evidence, that termination of Mother's parental rights is in the Children's best interest. The Juvenile Court found, in relevant part:

8. That Ms. Allmon's testimony, again unrefuted by Mother, was that Mother completed little of what was required of her. Mother did attend a psychological assessment with Dr. Mays, but there was no evidence that Mother followed through with any of his recommendations. Ms. Allmon testified that Mother moved some nine times during this matter. Ms. Allmon offered photographs of Mother's home (included in the State's Collective Exhibit 1) that showed the home to be unlivable. Again, Mother did not challenge these photographs were taken in her home. Ms. Allmon's testimony was that Mother later refused to allow her to enter her later homes, refused homemaker services, and generally stopped cooperating with her. Mother did not refute this testimony.

9. The testimony of Dr. Mays was that in his opinion, Mother was very low functioning mentally, was too dependent on others for advice and guidance (even when that advice or guidance resulted in negative effects), and was generally unable to care for a special needs child such as [Miranda]. Dr. Mays testified that he did not think services would be of significant help to Mother. As a result, Dr. Mays could not recommend return of the children to Mother. Again, Mother, did not challenge any of Dr. Mays' findings.

10. That based on the above, the Court finds that the State has proven by clear and convincing evidence the grounds of "abandonment" pursuant [to] Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c) in that Mother, even though initially working with DCS, has not shown any ability to provide a safe,

clean, suitable home for the children. Mother did in the early stages of this matter allow Ms. Allmon to enter some of her homes. However, when the pictures showed the home to be unlivable, Mother refused to allow Ms. Allmon into her later homes, and refused work with homemaker services. [Mother] did not offer any reason for not working services. This matter has gone on for two years, and during that time, Mother has not shown any willingness or ability to improve her living situation. The Court also finds it significant that DCS had been working with this family since 2012, with little or no improvement. For these reasons, the Court finds by clear and convincing evidence that the State has proven this ground for termination of Mother's parental rights.

11. Based on the above, and pursuant to Tenn. Code Ann. § 36-1-113(g)(3) the court finds that the State has proven by clear and convincing evidence the grounds of persistence of conditions as to Mother, in that:

(a) The children have been removed from Mother's home for at least six months;

(b) The conditions that led to the removal have not been rectified by Mother so that return to Mother's custody at this time, or at any reasonable time in the future, would result in harm to the children;

(c) That during the D&N hearing, Mother did testify and admit she could not financially or emotionally care for the children,

(d) That due to Mother's lack of any progress in meeting the goals of the [Permanency Plan], based on the testimony of Ms. Allmon, the Court finds by clear and convincing evidence that there is little likelihood that Mother will be able to correct these conditions in the near future; and

(e) That any continuation of the parent/child relationship between Mother and [Miranda] and [Baylee] greatly diminishes the chances that either child can integrate into a safe, stable and permanent home.

12. That based on the above, the Court finds the State has proven by clear and convincing evidence the ground of substantial non-compliance with the PP pursuant to TCA § 36-1-113(g)(2) as to Mother, in that:

(a) Mother did not challenge Ms. Allmon's testimony that Ms. Allmon explained Mother's responsibilities under two PP's or Ms. Allmon's testimony that Mother was not in substantial compliance with the goals of either plan.

(b) Mother also did not challenge that DCS had made reasonable efforts to assist her in meeting those responsibilities.

(c) Mother offered no plan of her on how she was going to remedy or correct the conditions that led to the removal.

(d) Mother offered no evidence that any of these situations would be remedied in the future.

(e) That because of all of these factors, the Court finds that continuing the parent/child relationship in this case as to Mother greatly diminishes the children's chances of being placed in a safe, stable, and permanent home.

(f) That the conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the children to be subjected to further abuse or neglect, preventing the children's safe return to the care of the parent or guardian;

(g) The Court finds no evidence that these conditions will be remedied by Mother at an early date so that the children could be safely returned to the parent or guardian in the near future.

(h) The Court also finds that the State has proven by clear and convincing evidence that continuation of the parent/child relationship greatly diminishes these children's chances of early integration into a safe, stable, and permanent home.

13. The Court finds the State has proven by clear and convincing evidence the ground of mental incompetence pursuant to TCA § 36-1-113(g)(8) as to Mother, in that:

(a) The testimony of Dr. Mays was that Mother was extremely low functioning mentally and emotionally. In fact, after observing Mother and [Baylee] playing, Dr. Mays opined that both Mother and [Baylee] "had similar levels of maturity."

(b) That when asked if it would be detrimental to [Miranda] to be returned to Mother, Dr. Mays stated "absolutely."

(c) Dr. Mays also stated that due to Mother's low functioning mental capacity, it was his opinion that parenting classes or additional services would be of little help to Mother as he felt she would be unable to put the recommendations into practice.

(d) While the Court finds this a much closer call than the other above grounds, the Court finds by clear and convincing evidence that due to Mother's mental limitations, she is not capable of taking care of children with the special needs that [Miranda] and, to a lesser extent, [Baylee] have, and therefore [the] Court finds the State has proven this ground for termination of Mother's parental rights by clear and convincing evidence.

14. That the Court finds it highly significant that Mother did not contest or challenge DCS's statements that it had used reasonable efforts to help mother comply with the permanency plans that were developed.

[Best Interest]

As to Mother, the testimony showed that Mother had not been able to maintain a suitable home, had not been willing to work with DCS-provided homemaker services, and eventually, stopped allowing DCS to visit her home. The testimony was also that Mother's boyfriend refused to work any DCS services. The Court finds it is not likely Mother will correct any of these issues in the near future, making it dangerous to return the children to her. The Court finds this factor weighs heavily in favor of termination of her parental rights being in the children's best interest.

***

As to Mother, Mother did not challenge DCS's statements that it had used reasonable efforts to help her correct conditions in her home or to help her with homemaker services or counseling help. However, Mother has not made any effort to correct the conditions of her home, or allow DCS to assist her. The Court finds this factor weighs heavily in favor of termination of her parental rights being in the children's best interest.

***

As to Mother, DCS did not allege that Mother failed to participate in visitation with the girls. In fact, Mother has expressed interest in having the girls return home, but the testimony of Dr. Mays was that return was not in the best interests of the children. This factor does weigh in slightly in favor of Mother.

***

As to Mother, the Court does not doubt that Mother cares for her children. However, the evidence was clear that due to Mother's low functioning cognitive capabilities, as testified to by Dr. Mays and as observed by the Court when Mother did testify at the D&N hearing, return to Mother would likely result in the same conditions that led to the removal. The factor does weigh in favor of termination of Mother's parental rights being in the best interests of the children.

-11-

\*\*\*

The Court finds this factor applies equally to both parents and weighs in favor of termination of the parental rights of Father and Mother. The only evidence presented at trial — and neither parent challenged — was that [Baylee] was doing well in foster care, and was even now reading on grade level. Due to the diagnosis of [Miranda], it is unlikely she will ever be able to function in a normal setting, and will likely require, according to Dr. Mays, 24 hour care and special treatment. The factor does weigh in favor of termination of both parents['] parental rights being in the best interests of the children.

\*\*\*

As to Mother, the testimony was the Mother's boyfriend was abusive and the girls did not like living with him. Ms. Allmon stated that Mother had indicated that her boyfriend was going to leave, but Ms. Allmon was never able to confirm that fact. This factor does weigh in favor to termination of Mother's parental rights being in the best interest of the children.

\*\*\*

As to Mother, DCS inspections of Mother's home indicated dangerous conditions for the children, cigarette ashes and butts in the floor, lack of consistent utilities, evidence of insects and rodents in the home and on the kitchen counters, and generally unclean, cluttered conditions. Dr. Mays' opinion was that Mother would not be able to correct these conditions on her own. This factor weighs heavily in favor that termination of Mother's parental rights to be [ ] in the children's best interests.

\*\*\*

As to Mother, Mother's mental state has been a concern for DCS workers from the beginning of this case. Based on the Court[']s observation of Mother during court proceedings (the Court notes that during one proceeding, Mother abruptly left the courtroom and did not return), the opinion of Dr. Mays, the conditions of Mother's home as shown in the pictures, it is clear to the Court that Mother continues to struggle mentally/emotionally so that return of children to her would be detrimental to them. The Court finds this factor weighs heavily in favor of a finding that the termination of Mother's parental rights to be in children's best interests.

-12-

*\*\*\**

As to Mother, there was no evidence concerning Mother's child support presented. The only testimony is that Mother draws SSI as her only source of income. The factor was not considered by the Court as to Mother.

*\*\*\**

This has been a long running case, with DCS being involved with this family since 2012. The evidence showed that Mother has made little or no progress toward correcting the issues that caused the initial removal. The record also shows that Father did not participate in the case significantly when it was filed in February of 2019, until January of 2020. The record also showed [that] on occasion, Father's attorney would appear in court and have no knowledge of where Father was. The Court also takes note of the special needs of [Miranda]. Neither parent showed any capability of being able to care for a child with the special needs [Miranda] has. [Baylee] also has developmental issues that require special care. Neither parent presented any evidence that either had a plan for taking care of the girls, had any family support, or showed any ability to handle special need children. The Court finds this is a key factor weighing in favor of a finding that the termination of parental rights of both Father and Mother to be in the children's best interests.

Mother timely appealed to this Court. In June 2021, the Juvenile Court, acting upon DCS's motion, entered an order awarding full guardianship of the Children to DCS.

## Discussion

Although not stated exactly as such, Mother raises the following issue on appeal: whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Children's best interest. DCS raises a separate issue of whether this Court should consider post-judgment documents contained in the record on appeal. DCS also addresses the grounds for termination found against Mother.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by

-13-

the Due Process Clauses of the federal and state constitutions.[2]  *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993).  But parental rights, although fundamental and constitutionally protected, are not absolute.  *In re Angela E.*, 303 S.W.3d at 250.  "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .'  Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child."  *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.  "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it."  *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388.  "Few consequences of judicial action are so grave as the severance of natural family ties."  *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996).  The parental rights at stake are "far more precious than any property right."  *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388.  Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child."  Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable").  In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings.  *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence.  *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388.  This standard minimizes the risk of unnecessary or erroneous governmental interference

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . .").  Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[4] Tenn. Code Ann. § 36-1-113(i).

substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion

-16-

of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Mother does not challenge any of the grounds found against her. However, the Tennessee Supreme Court has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote and citation omitted). We will, therefore, review each of the grounds found against Mother.

Four grounds for termination of parental rights are at issue on appeal. On April 17, 2020, when DCS filed its petition in this case, these grounds were set out in statute as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4;
(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

-17-

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

***

(8)(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

(ii) That termination of parental or guardian rights is in the best interest of the child;

(C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated[.]

Tenn. Code Ann. § 36-1-113(g) (West March 6, 2020 to April 21, 2021).

The type of abandonment at issue on appeal is abandonment by failure to provide a suitable home, which was defined as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

***

-18-

(ii)(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (West March 6, 2020 to June 30, 2021).

We first address DCS's issue of whether this Court should consider post-judgment documents contained in the record on appeal. The record does, indeed, contain certain post-judgment documents. DCS notes that we generally do not consider post-judgment facts except upon a party's motion pursuant to Tenn. R. App. P. 14. In its brief, DCS asserts that "any documents in the record dated after the trial court's June 8, 2021 order of guardianship are inappropriate for consideration, as they appear to have been improvidently included by the trial court clerk and no Tenn. R. App. P. 14 motion has been filed." (Footnote omitted). We agree. We will not consider these post-judgment documents contained in the record on appeal.

Turning to the grounds found for termination of Mother's parental rights, we address whether the Juvenile Court erred in finding that the ground of abandonment by failure to provide a suitable home was proven against Mother. On February 4, 2019, the Children were removed from Mother's custody by court order pursuant to a dependency and neglect

-19-

petition. As relevant to this issue, the Juvenile Court found that Mother "has not shown any ability to provide a safe, clean, suitable home for the children." The Juvenile Court found further that "[t]his matter has gone on for two years, and during that time, Mother has not shown any willingness or ability to improve her living situation." Despite DCS's assistance, Mother never established a home suitable for the Children. In fact, for stretches of the case, Mother refused outright to work with DCS on improving her home situation. The evidence does not preponderate against the Juvenile Court's findings relative to this ground. We find, as did the Juvenile Court, that the ground of abandonment by failure to provide a suitable home was proven against Mother by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding that the ground of substantial noncompliance with the permanency plan was proven against Mother. Two permanency plans were developed for Mother before DCS filed its petition. Regarding areas of compliance with the statement of responsibilities in her permanency plans, Mother completed parenting services and psychological assessments. She also remained in one home for at least six months. However, Mother never established a home suitable for the Children. Mother did not address domestic violence issues; she refused recommended homemaker services; denied DCS access to her home; and failed to address her mental health issues. Perhaps the most glaring example of Mother's noncompliance was Mother's outright refusal to accept homemaker services for stretches of the case when the unsuitability of her home was one of the central recurring issues preventing Mother from having a chance of reunification with the Children. This defiance, as well as the other instances of noncompliance found by the Juvenile Court, constituted substantial noncompliance with the permanency plans on Mother's part. We note further the Juvenile Court's finding that "Mother did not challenge Ms. Allmon's testimony that Ms. Allmon explained Mother's responsibilities under two PP's or Ms. Allmon's testimony that Mother was not in substantial compliance with the goals of either plan." The evidence does not preponderate against the Juvenile Court's findings relative to this ground. We find, as did the Juvenile Court, that the ground of substantial noncompliance with the permanency plan was proven against Mother by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding that the ground of persistent conditions was proven against Mother. On February 4, 2019, the Children were removed from Mother's custody by court order pursuant to a dependency and neglect petition. DCS's petition was filed on April 17, 2020, with trial initially set for October 23, 2020. The Juvenile Court found that "[t]he conditions that led to the removal have not been rectified by Mother so that return to Mother's custody at this time, or at any reasonable time in the future, would result in harm to the children[.]"; that "due to Mother's lack of any progress in meeting the goals of the [Permanency Plan], based on the testimony of Ms. Allmon, the Court finds by clear and convincing evidence that there is little likelihood that Mother will be able to correct these conditions in the near future[.]"; and "[t]hat any

-20-

continuation of the parent/child relationship between Mother and [Miranda] and [Baylee] greatly diminishes the chances that either child can integrate into a safe, stable and permanent home." Each of the elements of this ground have been established. Unfortunately, the evidence reveals that, despite the passage of time, Mother is no closer to being able to assume custody of the Children. Mother lacks a suitable home, as she has persistently throughout the custodial episode. As testified to by Dr. Mays, Mother functions at a low cognitive level. In order to overcome this issue so as to be able to safely parent the Children—who have special needs of their own—Mother needed to, at minimum, cooperate fully with all the recommended services aimed toward rendering her able to parent. Mother did not cooperate fully with these recommended services, and there is no evidence that her circumstances have materially improved. The evidence does not preponderate against the Juvenile Court's findings relative to this ground. We find, as did the Juvenile Court, that the ground of persistent conditions was proven against Mother by clear and convincing evidence.

The final issue pertaining to grounds is whether the Juvenile Court erred in finding that the ground of mental incompetence was proven against Mother. The Juvenile Court, noting Dr. May's testimony that "parenting classes or additional services would be of little help to Mother as he felt she would be unable to put the recommendations into practice," found that "due to Mother's mental limitations, she is not capable of taking care of children with the special needs that [Miranda] and, to a lesser extent, [Baylee] have…." The uncontroverted evidence reflects that Mother is in the low range of mental functioning, and she is highly dependent upon others. However, mental disability is not an *ipso facto* basis for finding the ground of mental incompetence. The statute allows for the possibility that an impaired parent or guardian may yet be able to assume care of and responsibility for her child in the near future. An impaired parent, unable to adequately care for her child on account of her mental condition, potentially can be rehabilitated or adjust so as to successfully cope with her condition. However, the record reflects that Mother has never taken the steps necessary to address her condition so as to assume care for the Children. Mother's refusal to accept homemaker services is an example of her failure to accept the help she needs. Mother has shown no ability to provide for the Children or attend to their special needs. Indeed, based upon Dr. Mays' report and testimony, it is unclear whether Mother will ever be in a position to assume responsibility for the Children. The Juvenile Court did not err in finding that, pursuant to Tenn. Code Ann. § 36-1-113(g)(8)(B)(i), Mother is incompetent to adequately provide for the further care and supervision of the Children because Mother's mental condition is presently so impaired and is so likely to remain so that it is unlikely that Mother will be able to assume care of and responsibility for the Children in the near future. Tenn. Code Ann. § 36-1-113(g)(8)(B)(ii) contains another element of this ground, namely that termination of parental rights is in the best interest of the child. As we will discuss in more detail in the next issue, the Juvenile Court found that termination of Mother's parental rights is in the Children's best interest, a

finding we affirm. The evidence does not preponderate against the Juvenile Court's findings relative to the ground of mental incompetence. We find, as did the Juvenile Court, that the ground of mental incompetence was proven against Mother by clear and convincing evidence.

Having affirmed grounds for termination, we consider whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Children's best interest. On April 17, 2020, when DCS filed its petition in this case, the statutory best interest factors read as follows:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (West March 6, 2020 to April 21, 2021).

With regard to making a determination concerning a child's best interest, the Tennessee Supreme Court has instructed:

> When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).
>
> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering

all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

Mother argues that the Juvenile Court erred in its best interest determination. Mother's arguments fit into three overarching categories, to wit: (1) that Mother was not afforded enough time—roughly nine months—between the July 2, 2019 dependency and neglect determination and the filing of DCS's termination petition on April 17, 2020; (2) that the Children desire to be with Mother and have a relationship with Mother; and (3) that the Children's prospects for permanency are uncertain because the Foster Parents have not committed to adopting Baylee, and Miranda is at a facility with no discharge date in sight. Mother also states that, given the Children's separate placements, terminating Mother's parental rights effectively would sever the Children's relationship not only with Mother but with one another. Mother contends that the Trial Court did not place sufficient weight on these relationships in conducting its best interest analysis.

Regarding Mother's first line of argument, Mother fails to articulate exactly what she would do with additional time or how additional time would lead to her being able to safely parent the Children. Mother refused to cooperate with DCS or homemaker services for stretches of the case. Mother nevertheless points out that she completed certain services through Camelot. That was good of Mother, but insufficient. Among other things, Mother needed to address the unsuitability of her housing situation, which she never did. Regarding Dr. Mays' assessment, Mother argues it is stale because Dr. Mays testified one-and-a-half years after his last interaction with her. However, Mother has not pointed to any evidence in the record showing that she has addressed her mental health and housing issues since Dr. Mays' assessment. On the contrary, the record reflects that Mother has made no material gains in addressing her issues. Additionally, there is no basis to assume that Mother's being in the low range of mental functioning has changed since Dr. Mays rendered his assessment.

With respect to the Children's sometimes-stated desire to be with Mother, that is a relevant but by no means dispositive fact for consideration in our best interest analysis. First, the record reflects that it was Miranda who occasionally expressed this desire. Miranda and, to a lesser extent, Baylee, both have special needs. The record reflects that Mother is in no position to provide for the Children's special needs, and will not be in any position to do so any time soon. Mother's practical inability to parent the Children outweighs any occasional preference the Children express about wanting to live with

Mother. Miranda, in particular, requires 24-hour care. Based on this record, there is no hint Mother will be able to provide that level of care in the near future, if ever.

Finally, there is the matter of the Children's uncertain permanency. Mother is correct in that neither of the Children have a firmly delineated path to permanency going forward. Miranda is at a facility, where she has no release date. Baylee lives with the Foster Parents, but the Foster Parents have reservations about adopting Baylee on account of her behaviors. Mother also cites her participation in Miranda's counseling, as well as the fact that termination of Mother's parental rights effectively means severance of the sisters' relationship with one another given their separate placements.

Respectfully, Mother has failed to establish how her participation in Miranda's counseling is vital to Miranda's well-being. In addition, Mother has failed to explain why separating the Children would be contrary to the Children's best interest. The Children, particularly Miranda, require special care. There is no hint whatsoever that Mother, with her own struggles, can provide this level of care for the Children. Mother, too, has mental health issues, with no realistic likelihood she will be able to safely parent the Children any time soon; this is the paramount and weightiest consideration regarding the Children's best interest under the facts of this case. Meanwhile, Baylee has shown significant improvement while in the Foster Parents' care. While the Foster Parents have expressed reservations about adopting Baylee, they have not definitively ruled it out, either. The Children's lack of certainty in their placements is not optimal, but preserving Mother's parental rights offers even fewer good prospects for the Children's best interest. As the Juvenile Court stated, there is no dispute that Mother loves the Children. It is Mother's persistent inability to safely parent the Children that is at issue.

The Juvenile Court made detailed findings relative to each applicable best interest factor. The evidence does not preponderate against the Juvenile Court's findings as to the Children's best interest. We find, as did the Juvenile Court, that termination of Mother's parental rights is in the Children's best interest.

## **Conclusion**

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Tiffany T., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE